Filed 10/10/23  P. v. Eidem CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C096458 |
| Plaintiff and Respondent, | (Super. Ct. No. 20CF02327) |
| v. | |
| ANTHONY JOSEPH EIDEM, | |
| Defendant and Appellant. | |

A jury found defendant Anthony Joseph Eidem guilty of forcible rape and disrupting computer services without permission.  The trial court sentenced defendant to eight years eight months in prison.  On appeal, defendant raises several claims of prosecutorial error, several claims of evidentiary error pertaining to the testimony of the prosecution's experts, and one claim of instructional error.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant owned a barbershop where the victim worked.  The victim thought defendant was a "horrible boss," as shown by his failure at times to provide air

1

conditioning to his employees. Given this treatment, when defendant's barbershop moved locations, a faction of the employees stayed behind and opened their own barbershop in the location defendant's shop had vacated. The victim was one of the employees to stay behind and work in the new shop. After defendant moved his business, employees at the new shop, including the victim, would talk poorly about defendant. The victim maintained friendships with her former colleagues and with the employees at the newly-created barbershop; however, there was animosity between the employees of the two barbershops.

In October 2019, the victim texted defendant " 'What time are you off, Ugly?' " Her intent was to be rude to defendant because she did not like him and thought he was a "horrible boss." Still, the victim wanted the two barbershops to mend fences and wanted to inquire from defendant about a job at his barbershop. To accomplish these goals, the victim invited defendant out for drinks. She met defendant at his barbershop and talked to her former colleagues who still worked for him. When she told them she was getting drinks with defendant, they responded, " 'Why would you do that?' "

During testimony, the victim could not recall much of the events of the evening with defendant. She recalled going to several bars and drinking beer and consuming at least one shot of alcohol. She did not recall defendant pressuring her to drink. She recalled being in defendant's car and then in his home. She did not recall telling defendant that she did not want to go to his house. The victim recalled that while in defendant's house, she crawled on the carpet yelling for his girlfriend, whom she believed lived with defendant. The victim yelled for defendant's girlfriend because she knew that if defendant's girlfriend was there, "[the assault] wouldn't have happened."

The victim also testified that she recalled defendant at some point getting on top of her and pulling up her shirt. She recalled defendant fondling and biting her breasts and strangling her with both of his hands. The victim told defendant, " 'Stop, that hurts,' " before losing consciousness. The next thing the victim recalled was locking herself in

2

defendant's roommate's room with defendant's roommate and then being in defendant's roommate's car. After stopping at a gas station, defendant's roommate took the victim to the police station,[1] after which she took part in a sexual assault exam. When preparing for the exam, the victim noticed her boot was unlaced, which she never did when taking off her boots, her underwear was only on one leg, and her bra was unclasped. The victim did not recall defendant penetrating her vagina with his fingers or his penis; however, there was "strong support" that defendant's DNA matched seminal fluid taken from the victim's vagina during the sexual assault exam. There was also "very strong support" that defendant's DNA matched DNA samples taken from the victim's neck.

Defendant's roommate testified that he first met the victim when she came home with defendant after the two went out drinking. The victim was obviously intoxicated and much more intoxicated than defendant. Later in the night, the victim walked into defendant's roommate's bedroom in pants soiled with urine and fell. Defendant came into the bedroom behind the victim and yelled at her for ruining his roommate's night and causing problems. Defendant's roommate told defendant to leave his room and that he would take care of the victim. Defendant complied. The victim "came to" and appeared "frantic." Defendant's roommate tried to calm her, but the victim kept saying, " 'You need to leave. Please leave. He's a bad man.' " The victim also told defendant's roommate that defendant raped her. Defendant's roommate drove the victim away from defendant's house and eventually drove her to the police station. While in the car with the victim, defendant's roommate noticed red marks on both sides of her neck. Pictures of the marks were shown to the jury.

During the sexual assault exam, the victim also had very little memory of the assault. Halfway through the exam, the victim indicated she remembered " 'struggling

---

[1]     The victim was interviewed at the police station and the interview was played for the jury. During the interview, she appeared intoxicated and had large gaps in recall.

3

and not being able to breathe because [defendant] was putting pressure on [her] neck and chest with his hands and arms. [She] remember[ed] pressure. [She] was distressed and needed to breathe, but could not.' " The victim's injuries included a swollen lip, bruises on the back of her arms consistent with fingerprints, bruises and scratches on her buttocks, and bruises on her neck. The bruises on her neck appeared bright red and tender and were located over the location of her carotid artery.

Chico Police Detective Cale Smith investigated the victim's allegation of rape. During a search of defendant's Facebook messages, Detective Smith saw that defendant had communicated with his girlfriend the night of the offense. Defendant's girlfriend messaged him after 10:00 p.m. to tell him that he was supposed to have met with his daughter that day. Defendant responded, "Ugh," and told his girlfriend to tell his daughter he could not call her because he was in a business meeting. Defendant's girlfriend knew he was out with the victim and told him to go home. At 11:25 p.m., defendant messaged his girlfriend that he was home. One minute later, defendant sent a video to his girlfriend of the victim crawling on her hands and knees on the floor of his home with his roommate in the background asking the victim if she wanted water. The video was played for the jury.

The victim left her phone at defendant's house. Defendant's girlfriend testified that she and defendant searched the contents of the victim's phone. Defendant's girlfriend also testified that she knew the victim to be flirtatious, especially with defendant. The night defendant was out with the victim, his girlfriend sent him a text message stating, " 'Don't make out or fuck [the victim]. You know she likes you.' " Defendant's girlfriend communicated with defendant throughout the night, through text/social media messages and phone calls. She told defendant to go home because she was uneasy with defendant and the victim being together given her belief that the victim was attracted to him. On cross-examination, the prosecutor asked defendant's girlfriend whether her actual concern was that defendant was a "cheater" and not that the victim

4

was attracted to him. Defendant's girlfriend testified that she was not worried about defendant being a "cheater." The prosecution then impeached defendant's girlfriend over defendant's objection with text messages between herself and defendant demonstrating her reaction to defendant having slept with other women. On redirect examination, defendant's girlfriend clarified that she and defendant were in an open relationship such that they could date and have sexual intercourse with other people. Also on cross-examination, the prosecutor confronted defendant's girlfriend with text messages in which defendant belittled her and called her a failure. In response, defendant's girlfriend messaged him that she does everything he asks of her. Defendant's girlfriend clarified that her statement was made in the context of their professional life and not her personal life.

Defendant testified that his night with the victim progressed into a date and the two started kissing. He was drunk but drove the victim to his house. During the drive, he touched her leg and she touched his hand. Defendant testified that he and the victim had consensual sex shortly after arriving at his house. He then introduced the victim to his roommate and took the video of the victim crawling on the floor. Defendant denied strangling the victim.

When asked by his counsel what happened when the two arrived home, defendant answered, "When I got back to the house, we went in, I told—I remember, I do remember her yelling for [my girlfriend], but I presumed to make sure that [she] wasn't there, not that she was there." The prosecution objected to defendant's answer because it was not in response to the question. The trial court sustained the objection and defense counsel did not follow up with further questions pertaining to defendant's state of mind when arriving home. When asked by the prosecution whether he had seen any positive messages on the victim's phone when he looked through it, defendant answered that he had seen a lot of positive things and that the messages between them personally were always positive.

5

Detective Smith spoke to defendant three months after the incident. During the conversation, defendant did not say he and the victim had sex on the night in question. When asked whether he had seen anything flirtatious between defendant and the victim when searching the victim's phone records, Detective Smith said the communications were all about work.

The jury found defendant guilty of forceable rape and disrupting computer services without permission. The trial court sentenced defendant to eight years eight months in prison.

Defendant appeals.

## DISCUSSION

### I

### *Prosecutorial Error*

Defendant raises several contentions of prosecutorial error, including that the prosecutor misstated the law in closing argument, alluded to evidence not admitted at trial, and impermissibly relied on character evidence.

" ' " ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " ' " (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 241.)

We review de novo a defendant's claim of prosecutorial error. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860.) When determining whether a prosecutor acted egregiously or deceptively, we " ' "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.) We presume, in the absence of

6

evidence to the contrary, that the jury understands and follows instructions from the trial court (*People v. Fauber* (1992) 2 Cal.4th 792, 823); and that the jurors treat the court's instructions as statements of law, and the arguments of the counsel as words spoken by an advocate in an attempt to persuade (*People v. Thornton* (2007) 41 Cal.4th 391, 441; see CALCRIM No. 222 [statements of counsel are not evidence]). We consider the prosecutor's remarks in context of the entire record. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 665-666.)

## A

### *The Prosecutor Did Not Misstate The Law During Closing Argument*

Defendant contends the prosecutor erred during closing argument by misstating the law twice. First, he argues the prosecutor misstated the reasonable doubt standard when arguing that she did not have to prove defendant's guilt to a " 'near certainty.' " Second, he argues the prosecutor misstated the law when telling the jury it was required to reject inferences that were not based on the evidence. We disagree with both contentions.

Pertaining to the burden of proof, the prosecutor argued in rebuttal argument that defense counsel "misstated a lot. And I want to address some of those misstatements. [¶] For one, he kept saying 'near certainty.' 'Must be near certainty.' 'The prosecution's case must be near perfect.' You will find that absolutely nowhere in the law that the judge gives you. Nowhere. That's not what the law says. Why? Because, as I showed you, everything in life is open to some possible or imaginary doubt. Near certainty is not the standard. The standard is reasonable doubt. That was a misstatement."

Defendant argues a "near certainty" is often used in case law to define the reasonable doubt standard, and thus the prosecutor's statement that defense counsel misstated the law was wrong. We take the prosecutor's argument to mean that the term "near certainty" was not included in the jury instructions given by the court, which it was not. The instructions inform the jury that reasonable doubt meant it must hold "an

7

abiding conviction that the charge is true" and that "[t]he evidence need not eliminate all possible doubt." (CALCRIM No. 220.) While case law may describe this standard as a near certainty (see *People v. Thompson* (1980) 27 Cal.3d 303, 324; *People v. Reyes* (1974) 12 Cal.3d 486, 500), the prosecutor referred the jury to the jury instruction as its guiding post for the standard it was to apply and the instructions did not include the phrase "near certainty." As the trial court said when defendant objected to the prosecutor's reasonable doubt rebuttal argument, the jury was instructed to follow the jury instructions and ignore the lawyers' arguments if those arguments conflicted with the law contained in the jury instructions. (CALCRIM No. 200.) Accordingly, the prosecutor did not commit error when describing the reasonable doubt standard to the jury.

Pertaining to circumstantial evidence, the prosecutor told the jury that direct and circumstantial evidence can equally be used to prove guilt. The prosecutor continued, "Now, [defense counsel] made a huge to-do about this instruction that says if you can draw two or more . . . reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. [¶] That's correct. That's the law. You know what he left out? Conclusions from the circumstantial evidence. It has to be in evidence. It has to be the testimony, the exhibits in the case, not [defense counsel]'s imaginary scenarios that he's asking you to consider. He doesn't want you considering the evidence. He wants you considering imaginary scenarios. That's against the law. The law says you must draw—if there are two or more reasonable conclusions from the evidence. Not from [defense counsel]'s made-up, imaginary scenarios. Cannot, cannot consider his explanations or his made-up scenarios. You cannot consider that. You can only consider what was in evidence; okay?"

As an example of what the jury was precluded from doing, the prosecutor said "[d]efense [c]ounsel . . . picks apart little things that are in evidence, and he asks you to

compare them to things that are imagined. 'Imagine this scenario. Well, I would submit to you that the mark on her neck could be caused by her shirt coming up.' That's not in evidence. You can't consider that. That's [defense counsel] making something up. No one testified, 'Oh, yeah, I remember when I took her shirt off, I scratched her.' Nobody testified to that. It's not in evidence. You can't think of it."

We do not interpret the prosecutor's argument regarding circumstantial evidence as a misstatement of law. The jury was instructed on circumstantial evidence as follows: "If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224.) While the prosecutor's argument was one of absolutes regarding what the jury could or could not consider, in context of the prosecutor's argument and the circumstantial evidence instruction (CALCRIM No. 224), the prosecutor's argument was akin to arguing that it was *unreasonable* to infer the shirt's removal caused the bruising because nobody ever testified that the victim's shirt was removed.

Again, the jury was instructed to follow the law as it was provided by the trial court and to disregard the lawyers' arguments if they conflicted with the law. (CALCRIM No. 200.) Importantly, the jury was also instructed that it was the sole decider of fact. (CALCRIM Nos. 104, 200.) "[A] prosecutor is allowed to vigorously argue the case and is afforded 'significant leeway' in discussing the facts and the law in closing argument." (*People v. Azcona* (2020) 58 Cal.App.5th 504, 516.) Even if the prosecutor makes one statement that "when viewed in isolation, [does] misstate the law," there is no error if, "in the context of the entire argument and jury instructions, it was not reasonably likely the jury understood or applied the statement in an improper or

erroneous manner." (*People v. Meneses* (2019) 41 Cal.App.5th 63, 66.) We conclude that is the case here.

B

*The Prosecutor Did Not Allude To Evidence Outside The Record*

Defendant contends the prosecutor erred by referring to evidence outside the record when she told the jury during rebuttal argument that evidence of defendant's violent character was not admitted at trial. Defendant also argues this evidence served to shift the burden of proof to defendant to prove he was a peaceful man, and thus innocent of the crimes charged. We disagree.

A prosecutor may not "refer[] in argument to matter outside the record." (*People v. Pinholster* (1992) 1 Cal.4th 865, 948, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

In rebuttal argument, the prosecutor responded to many of the assertions defense counsel made during his own closing argument. In part, the prosecutor said, "[Defense counsel] also made some big deal, he made a statement, 'Where is the evidence of my client being violent in the past? This man, who has never been accused of these things before, where is the evidence of it?' I'd submit two things to you about that. One, when I asked him, 'Are you violent?' there was an objection, and he was not allowed to answer. There is no evidence in this case that he was a peaceful man. There's no evidence of that. There's no evidence that he was a previously violent man because that wasn't allowed to come in, nor was his peacefulness or lack of peacefulness allowed to come in. That's not in evidence. [¶] [Defense counsel] is saying, 'Where, where is the evidence of it?' Well, it's not in evidence. You're right. We can't consider that. But you also can't assume that he was peaceful, because there's zero evidence that he's lived this law-abiding, peaceful life. That's not in evidence. Not at all."

Given the context of the prosecutor's argument, a jury would not reasonably interpret her argument as referencing evidence outside of the record. Instead, the

10

prosecutor assured the jury, consistent with the evidence admitted at trial, that there was no evidence of defendant's character for peacefulness or for violence, and thus the jury could not consider it. This was a fair comment on the evidence and did not place the burden on defendant to prove his innocence by demonstrating a character for peacefulness.

C

*The Prosecutor's Conduct Did Not Constitute Prejudicial Error*

Defendant argues the prosecutor generally used reprehensible and deceptive trial tactics to place defendant's character at issue with the jury and to keep from the jury key items of evidence in defendant's favor. We disagree.

Defendant first points to the prosecutor's argument that Evidence Code[2] section 1103 precluded the admission of defendant's text message to the victim in which he said, "[T]hat's the best booty call I've ever had." Defendant argues that the prosecutor's argument against admission was patently wrong and that she induced evidentiary error. The People concede the evidence should have been admitted under section 1103. We do not decide whether the text message was admissible under section 1103 as evidence of the victim's prior sexual conduct with defendant or whether the prosecutor acted egregiously when arguing for its exclusion. In the end, any error in excluding the text message, or in the prosecutor's argument, was not prejudicial to defendant's case because the text message should have been excluded on other grounds—hearsay.

With the introduction of the text message, defendant did not seek to introduce reputation evidence tending to demonstrate he and the victim had previously engaged in sexual intercourse. (§ 1324 ["Evidence of a person's general reputation with reference to his character or a trait of his character at a relevant time . . . is not made inadmissible by

---

[2]     Further section references are to the Evidence Code.

11

the hearsay rule"].)  He also did not seek to introduce evidence from his or the victim's personal knowledge demonstrating they had previously had sexual intercourse.  Instead, defendant moved to admit his self-serving statement, in the form of a text message, which implied he previously had sex with the victim.  The text message is a statement offered for its truth, i.e., that defendant had a "booty call" with the victim, and it was offered by the party who made the statement—the text message is hearsay.  (See § 1200, subd. (a) [" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"].)  While section 1103 is an exception to the exclusion of character evidence under section 1101 (§ 1103, subd. (a)(1)), section 1103 is not an exception to the exclusion of hearsay and defendant has not pointed us to any hearsay evidence exception that applies in this case.  The evidence thus should have been excluded regardless of the prosecutor's argument pertaining to section 1103.

The same is true concerning defendant's proffer that his girlfriend would testify that she told defendant the night he went out with the victim that the victim would crawl into bed with him.  This out-of-court statement is hearsay if offered for the truth, i.e., to show the victim was likely to crawl into bed with defendant the night of the offense.  Defendant's girlfriend lacked personal knowledge and foundation for her belief.  Defendant's girlfriend was permitted to testify to her personal observations that the victim was flirtatious, especially with defendant.  But the fact that defendant's girlfriend believed and communicated to defendant that the victim would crawl into bed with him that night was not based on the victim's statements regarding her intent, nor was it based on defendant's girlfriend's perceptions of the victim while she was out with defendant that evening.  Thus, defendant's girlfriend's opinion was inadmissible, regardless of the application of section 1103.  (See *People v. Thompson* (2010) 49 Cal.4th 79, 130 [" 'A witness who is not testifying as an expert may testify in the form of an opinion only if the opinion is based on [her] own perception' "].)

Defendant next contends the prosecutor induced evidentiary error by making an improper objection to defendant's explanation of his state of mind. Specifically, defendant points to his counsel's question regarding what happened upon his arrival at home with the victim. Defendant testified the victim yelled out for his girlfriend and he presumed it was because she wanted to make sure his girlfriend was not home. The prosecutor objected to defendant's testimony regarding his state of mind as being unresponsive to the question. The trial court sustained the objection and struck defendant's answer. Defendant argues his answer was a response to the question and, because of the prosecutor's improper objection, the jury was left with only the victim's testimony that she called out for defendant's girlfriend because she knew the assault would not happen if defendant's girlfriend was at defendant's house.

The premise of defendant's argument is faulty—the prosecutor did not induce evidentiary error. Testimony regarding defendant's state of mind when the victim called for his girlfriend was unresponsive to the question asked by his counsel regarding the circumstances of his arrival at home with the victim. The question called for the events pertaining to arrival and not defendant's state of mind related thereto. To be sure, defendant's state of mind was admissible, but his counsel did not ask any follow-up questions in this regard. It was incumbent on defendant and his counsel to introduce evidence favorable to his position. The fact the evidence revealed at trial tended to support the prosecution's case cannot be construed as error under these facts, and fault for any alleged error cannot be laid at the prosecutor's feet.

Defendant next points to the prosecutor's introduction, and the trial court's admission, of text messages between defendant and his girlfriend tending to show defendant cheated on his girlfriend. To defendant, this testimony was irrelevant because defendant's girlfriend clarified that she and defendant were in an open relationship and he was permitted to have sexual intercourse with other women. Thus, defendant's reasoning

13

follows, questions pertaining to whether he cheated on his girlfriend were asked by the prosecutor for the sole purpose of showing he was a bad person. Not so.

Defendant's girlfriend testified that she was worried about the victim going out with defendant because she knew the victim was flirtatious with defendant and found him attractive. This testimony supported defendant's defense by tending to show defendant reasonably believed, like his girlfriend, that the victim wanted to engage in consensual sex with him. To the contrary, however, defendant's girlfriend's text messages pertaining to another woman with which she believed defendant had sexual intercourse tended to show her worries were not about the victim's behavior but about defendant's behavior. In other words, the prosecutor impeached defendant's girlfriend's testimony that she believed the victim wanted to sleep with defendant. This was the reason the prosecutor stated the text messages were relevant and the reason for which the trial court admitted the evidence. The prosecutor did not argue that because defendant had the character of a cheater, he was also rapist. Indeed, the evidence was limited to the purpose of impeaching defendant's girlfriend's testimony and that was the purpose for which it was used.

The same is true for the text messages between defendant and his girlfriend providing that she would do whatever he asked of her despite him treating her poorly. While defendant argues the text messages were irrelevant because all they tended to show was defendant's disposition, the text messages were also relevant to show defendant's girlfriend's credibility and her willingness to do whatever defendant wanted her to do despite reasons to the contrary. Still, we agree with defendant that, in addition to using the text messages to demonstrate defendant's girlfriend lacked credibility, the prosecutor argued in closing argument that the text messages also demonstrated that defendant was delusional, had a superiority complex, and expected everyone to do as he asked. The prosecutor's argument in this regard was improper because it went beyond the scope of the reason the underlying evidence was admitted and pertained directly to defendant's

14

character.  We discern no prejudice, however, because the argument was fleeting and did not constitute a pattern of conduct that denied defendant a fair trial or deceived the jury into relying on an impermissible theory of guilt.

Defendant further points to testimony concerning his treatment of his employees and the victim's categorization of him as a terrible boss.  The problem with defendant's contention is that he did not object to this testimony at trial and instead even questioned the victim about her feelings toward defendant.  Indeed, defendant relied on the victim's ill feelings toward him during closing argument to attack the victim's credibility.  His failure to object and request a timely admonition precludes defendant from relying on that evidence now to demonstrate error.  (See *People v. Hinton* (2006) 37 Cal.4th 839, 863 [to preserve a claim of prosecutorial error for appeal, a defendant must object in a timely fashion on that ground and request a curative jury admonition unless an admonition would not have cured the harm caused by the misconduct].)

Finally, defendant points to the prosecutor's introduction of the contents of the first text messages sent between himself and his girlfriend the night he was out with the victim.  The messages were admitted to show the timeline of the evening, which defendant appears to concede was proper.  Defendant, however, takes issue with the contents of the messages being admitted because the contents merely show defendant forgot to spend time with his daughter and lied to her about his whereabouts.  To defendant, the contents of the messages were irrelevant and improper character evidence.  Again, defendant did not object to the admission of these text messages.  And, as defendant appears to concede, the messages were relevant to show the timeline of the evening and were not offered for their truth, and thus were not hearsay.  Accordingly, defendant has not demonstrated that the prosecutor denied him a fair trial or used deceptive or reprehensible methods when introducing the substance of defendant's text messages with his girlfriend.  In sum, defendant's arguments of prosecutorial error lack merit.

15

## II

### *Opinion Testimony Contentions*

Defendant contends that two of the prosecution's witnesses were not qualified to testify as experts. Specifically, he points to the nurse who examined and the officer who interviewed the victim. Both witnesses testified to their knowledge regarding the carotid artery, and the nurse additionally testified to her expertise as it relates to strangulation and rape trauma syndrome.

### A

### *Background*

Jacqueline Winters-Hall testified on behalf of the prosecution as a supervising nurse specializing in sexual assault forensic exams and as the nurse who examined the victim. Her duties included training nurses at her hospital in conducting forensic exams, as well as nurses attending training centers. Winters-Hall testified she had attended several trainings through the Strangulation Training Institute and taken several webinars, as well as attended strangulation breakout sessions at conferences. She developed the clinical guidelines for strangulation at the hospital where she worked, which guides all the doctors and nurses in the hospital. She has also treated patients who have presented with signs of strangulation.

Winters-Hall based her knowledge regarding strangulation in part on a publication describing "what happens from the moment a person is strangled from the time the pressure is applied to when death happens or respiration ceases." The publication was based on two studies in which researchers observed an adult male's reaction to strangulation. Because the studies pertained to adult males, Winters-Hall believed the timing of certain reactions would be shorter if the person being strangled were a child or female. The reaction time would also be shorter if the person being strangled had consumed alcohol.

16

Winters-Hall testified that the studies demonstrated that at zero seconds into the act of strangulation, the carotid artery becomes blocked and blood stops flowing to the brain. Five to ten seconds into strangulation, a person will become unconscious. At 14 seconds, the person being strangled will have an anoxic seizure due to lack of oxygen. After 15 seconds, a victim of strangulation experiences a loss of bladder control, then after 30 seconds a loss of bowel control. At 62 seconds, the studies demonstrate that a person will stop breathing and die.

Winters-Hall testified that strangulation adversely affects both short-term and long-term memory. Indications of strangulation are loss of memory and external injuries such as, marks, bruises, or scrapes on the neck. It is also common to see petechiae, which are broken blood vessels under the skin. According to Winters-Hall's training, about 50 percent of deceased victims of strangulations have external injuries. In Winters-Hall's opinion, the markings on the victim's neck, the loss of bladder control, memory loss, and vomiting were all consistent with having been strangled. Specifically, the victim had redness on her neck in the location of the carotid artery.

Winters-Hall also received training related to rape trauma syndrome, which describes the brain's response to trauma and helps medical practitioners understand why patients behave the way they do. Importantly, according to Winters-Hall, the ability to maintain memory is changed by the body's physiological response to trauma. Defendant objected to this testimony asserting it lacked foundation. The trial court overruled the objection.

The prosecution also called Detective Smith to testify on the topic of the carotid artery. Detective Smith testified that he had been a police officer for 15 years. In addition to his duties as a detective, he was also a use-of-force trainer at his previous police department and at the Chico Police Department where he now worked. In that role, he trained people on carotid restraints, which are commonly referred to as choke holds. According to Detective Smith, the carotid restraint is a technique formerly used by

17

police officers to restrict oxygenated blood flow to someone's brain by compressing or putting pressure on the carotid arteries in the neck. When asked about the significance of the red marks on the victim's neck, Detective Smith responded that it appeared the red marks were "right over the area of her carotid artery that runs—as you look, as you look in the picture, it would be running along her neck at a diagonal direction, from the bottom right to the top left portion of her jawline." In Detective Smith's opinion, putting pressure on that spot of a person's neck would cut off blood circulation and cause the person to become unconscious. Bruising on the other side of the victim's neck indicated to Detective Smith, and other officers he consulted, that someone used their hand to apply pressure with the thumb on one side of the neck and with the other fingers on the other side. Defendant's objection to the last portion of Detective Smith's testimony was overruled.

## B

### *Winters-Hall's Testimony Was Admissible*

Defendant contends Winters-Hall was not qualified as an expert to testify regarding strangulation, the location of the carotid artery, or rape trauma syndrome, and thus her testimony on those topics was improper. Defendant also argues that the rape trauma syndrome evidence should have been excluded because it was irrelevant to the particular facts of the case. We disagree.

"A person is qualified to testify as an expert if he [or she] has special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his [or her] testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (§ 720, subd. (a).) A defendant who fails to object to an expert's qualifications at trial forfeits the argument that the expert's testimony was inadmissible because the expert was not qualified to testify about the particular topics at issue. (See *People v. Bolin* (1998) 18 Cal.4th 297, 321; *In re Estate of Odian* (2006)

18

145 Cal.App.4th 152, 168 [any objection to the admissibility of expert opinion on appeal was forfeited by failure to object at trial]; *People v. Rodriquez* (1969) 274 Cal.App.2d 770, 775, [an appellant cannot challenge an expert's qualifications for the first time on appeal].)

Here, defendant did not object to Winters-Hall's testimony on the basis that she was unqualified as an expert regarding strangulation and the location of the carotid artery. The only objections lodged during Winters-Hall's testimony related to these topics was to her testimony that the time frame within which a person experiences the effects of strangulation is shortened when that person consumes alcohol. Defendant's objections were specific to Winters-Hall's testimony regarding alcohol consumption because the studies upon which Winters-Hall based her opinions did not include subjects who had consumed alcohol. This was not a challenge to Winters-Hall's qualification regarding the topics of strangulation and the location of the carotid artery.

Defendant also objected before trial to Winters-Hall's testimony related to strangulation because the prosecution did not properly notify him that Winters-Hall would testify on that subject. This was not an objection to Winters-Hall's qualifications but was instead an argument that the prosecution committed a discovery violation. The trial court found the argument unavailing, and defendant does not challenge that ruling on appeal. Taken together, defendant never objected to Winters-Hall's qualifications as an expert on strangulation or the location of the carotid artery, and thus he has forfeited those contentions on appeal. As a result of this conclusion, we similarly reject defendant's argument that Winters-Hall was precluded from relying on a photograph taken by defendant's roommate when forming her opinion that red marks on the victim's neck were located near the carotid artery. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 686 [experts may rely on case-specific facts outside their personal knowledge when the facts have been properly admitted under the rules of evidence].) In any event, Winters-Hall testified to numerous photographs she took of the victim and her own perceptions of

19

the victim's injuries when testifying to her opinion that red marks on the victim's neck were in the location of the victim's carotid artery, and thus she supplied adequate foundation for her testimony.

As it pertains to rape trauma syndrome, defendant objected to Winters-Hall's testimony on foundation grounds, which the trial court overruled. This was sufficient to preserve his claim that Winters-Hall was not qualified to testify on the subject. Expertise may be established by a showing that the witness " 'has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion.' " (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294.) We review the trial court's ruling that an expert is qualified to testify on a particular subject for an abuse of discretion. (*People v. Brown* (2014) 59 Cal.4th 86, 100.)

Here, Winters-Hall testified that she was a supervising nurse who specialized in sexual assault forensic exams and her duties included training nurses at her hospital in conducting forensic exams, as well as nurses attending training centers. When describing rape trauma syndrome, Winters-Hall specified that practitioners such as herself utilize the syndrome to help explain why patients who have experienced sexual assaults act the way they do. This testimony provided sufficient foundation that Winters-Hall has utilized rape trauma syndrome in her practice of treating patients and training nurses to conduct forensic exams. The trial court did not abuse its discretion when finding Winters-Hall qualified to testify on the subject of rape trauma syndrome.

Additionally, testimony pertaining to rape trauma syndrome was relevant in this case. At the outset, we reject defendant's argument that the rape trauma syndrome evidence here "was offered improperly to prove that in fact, [the victim] had been raped." As Winters-Hall testified, rape trauma syndrome describes the brain's response to trauma and helps medical practitioners understand why patients behave the way they do. Specifically, the syndrome explains why patients have gaps in memory or are unable to

20

maintain clear memories of the trauma. In this vein, rape trauma syndrome is admissible to rebut the inference that a rape did not take place due to the victim's conduct that may appear inconsistent with the victim having been raped. Evidence of the syndrome may be offered to disabuse the fact finder "of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248.)

Here, defendant cross-examined the victim extensively about the circumstances of her assault and pointed out various gaps in her memory and inconsistent statements she made to police officers and Winters-Hall. Given defendant's cross-examination of the victim, the prosecution was permitted to elicit evidence regarding rape trauma syndrome to disabuse the jury of the commonly held misconception (and inference the defendant urged through his questioning) that, because the victim could not recall details of the rape, she was not a victim of rape. In line with the permissible use of rape trauma syndrome, the prosecutor argued during closing argument that the victim's lapse in memory and recall was not probative of her credibility given Winters-Hall's testimony regarding rape trauma syndrome. Accordingly, evidence pertaining to rape trauma syndrome was not admitted or used for an improper purpose, and defendant's claim to the contrary lacks merit.

C

*Detective Smith's Testimony Was Admissible*

Defendant contends that Detective Smith was not qualified to give an opinion about the location of the carotid artery, and further could not have done so by looking at a photograph of the victim's neck. We disagree.

Like Winters-Hall's testimony related to the location of the carotid artery, defendant did not object to Detective Smith's testimony related to the location of the carotid artery. On appeal, defendant cites to one of his counsel's objections to Detective Smith's testimony, seemingly arguing that the court should have excluded Detective

21

Smith's testimony related to the carotid artery in general. Not so. Defense counsel's objection took issue only with Detective Smith's testimony about the effects on the body resulting from a carotid restraint. The objection was sustained, and the prosecutor agreed that Detective Smith did not have the expertise to testify to such evidence and limited the question to the location of the carotid artery. Defendant did not object to this question or Detective Smith's qualifications to answer it. Indeed, defendant affirmatively agreed Detective Smith held the requisite qualifications through his training and experience to testify about the carotid restraint and the process of performing the restraint successfully. Thus, defendant has forfeited his appellate challenge to Detective Smith's qualifications regarding the location of the carotid artery.

Still, however, defendant argues that Detective Smith should have been precluded from relying on a photograph taken by defendant's roommate when forming his opinion that the markings on the victim's neck were over her carotid artery and appeared to be the product of a hand squeezing her neck. But, as explained, experts are permitted to rely on and testify about case-specific facts when those facts have been properly admitted into evidence. (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 686.) Defendant's roommate authenticated the photograph of the red marks on the victim's neck and the photograph was admitted into evidence. Thus, Detective Smith was permitted to testify to an opinion based on that photograph.

Defendant objected to Detective Smith's testimony regarding the cause of the bruising around the victim's neck arguing the testimony lacked foundation, and thus that contention has been preserved for appeal. It was not an abuse of discretion for the trial court to overrule defendant's objection. Detective Smith testified that he was trained, and had trained others, to perform the carotid restraint in ways that would inflict the least damage to the person being restrained. He then described the damage he saw on the victim's neck and testified to the technique he believed was used to inflict that damage. Given Detective Smith's position as a use-of-force trainer, it was not an abuse of

22

discretion for the trial court to permit him to testify regarding the technique used to strangle the victim and how it differed from the technique taught in the use-of-force context. To the extent, however, that Detective Smith testified he spoke to other investigators who shared his opinion regarding the cause of the victim's bruises, that testimony was improper hearsay. While defendant did not object to Detective Smith's testimony on that ground, any error was harmless given the brief nature of the testimony and the fact that Detective Smith was permitted to testify to the substance of his opinion.

Accordingly, defendant's contention that the trial court improperly admitted expert opinion testimony lacks merit.

III

*The Trial Court Was Not Required To Instruct On Battery Or Assault*

Defendant requested the trial court to instruct the jury on the lesser included offenses of assault and battery. The trial court denied the request because there was no evidence defendant committed only assault or battery and the only issue before the jury was whether the victim consented to intercourse. Defendant contends this was error; however, he limits his appellate argument to the lesser included offense instruction for battery by failing to analyze whether the evidence demonstrated an assault. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [conclusory statements without argument and authority are deemed forfeited].)

We review a claim of instructional error de novo. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) " ' "The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." ' [Citation.] As [has been] explained, instructing on lesser included offenses shown by the evidence avoids forcing the jury into an 'unwarranted all-or-nothing choice' [citation] that could lead to an unwarranted conviction." (*People v. Hughes* (2002) 27 Cal.4th 287, 365.) " ' "[T]he existence of '*any*

23

evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." ' " (*People v. Woods* (2015) 241 Cal.App.4th 461, 474.)

Battery is a lesser included offense of rape. (*People v. Miranda* (2021) 62 Cal.App.5th 162, 174, review granted June 16, 2021, S268384 [review granted on issue of whether it is an equal protection violation to exclude young adults convicted under the one strike law from early parole consideration].) "A battery is any willful and unlawful use of force or violence upon the person of another." (Pen. Code, § 242.)

Defendant argues that substantial evidence supports a theory that he committed only battery. Specifically, he argues that, if the jury found he actually and reasonably believed the victim had consented but also that the victim did not in fact consent, it would have found him guilty of battery. To defendant, the only reason the jury selected rape was because its other option was to select acquittal. If the jury had the option of selecting battery, the argument continues, it would have. Not so.

It is unclear as to which offensive touching defendant refers when making his argument the jury could have found him guilty of battery. If the offensive touching is the intercourse itself, then defendant's reasonable belief the victim consented is a defense to battery based on that touching. (See *People v. Samuels* (1967) 250 Cal.App.2d 501, 513 [consent is a defense to battery when the alleged offensive touching does not threaten bodily harm]; see also *People v. Rivera* (1984) 157 Cal.App.3d 736, 742 [where a defendant reasonably believes the touching constituting the offense was consensual he cannot be guilty if there is nothing unlawful about the physical contact].) Thus, if the jury believed defendant's version of events—that he did not strangle the victim and that he actually and reasonably believed she had consented to intercourse—then defendant did not commit a battery and the jury would have been compelled to find him not guilty regardless of its belief that the victim subjectively withheld consent.

On the other hand, defendant appears to argue the jury could have found him guilty of battery based on findings he actually and reasonably believed the victim consented to intercourse but not to the strangulation. The problem with defendant's argument is that the strangulation was not alleged to be collateral to the sexual intercourse. The victim testified that the strangulation occurred during the rape. Defendant did not controvert that testimony and instead testified the victim consented to intercourse and the strangulation did not occur at all. Thus, under the facts of this case, if the jury believed the strangulation occurred, it believed it occurred during the intercourse. A finding that the victim did not consent to being strangled during intercourse was the equivalent of finding the victim withdrew consent to intercourse. (See CALCRIM No. 1000 ["The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse and actually and reasonably believed that she consented throughout the act of intercourse"].)

Indeed, "[t]he essence of consent is that it is given out of free will. That is why it can be withdrawn. While there exists a defense to rape based on the defendant's actual and reasonable belief that the victim does consent [citations], we do not require that victims communicate their lack of consent. [Citation.] We certainly do not require that victims resist." (*People v. Ireland* (2010) 188 Cal.App.4th 328, 338.) When defendant strangled the victim during intercourse, and in the absence of any conduct by the victim indicating her continued consent, the previously given consent no longer existed, either in fact or in law. (*Ibid.*; see *People v. Washington* (1962) 203 Cal.App.2d 609, 610 ["Consent induced by fear is no consent at all"].) Thus, defendant could not have been found guilty of battery based on findings he reasonable believed the victim consented to intercourse but not to being strangled. Accordingly, the trial court did not err by denying defendant's request the jury be instructed on the lesser included offense of battery.

## DISPOSITION

The judgment is affirmed.

25

                                      /s/
                                    ROBIE, Acting P. J.

We concur:

/s/
KRAUSE, J.

/s/
BOULWARE EURIE, J.